IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02769

ESCAPE VELOCITY SYSTEMS, LLC,
a Colorado limited liability company,

      Plaintiff,

v.

JUDD SWANSON, an individual; and
OFFICE OF MUSEUM RESEARCH, LLC,
a Texas limited liability company,

      Defendants.

## COMPLAINT

Plaintiff Escape Velocity System, LLC ("EVS") submits the following Complaint:

## PARTIES

1. Plaintiff EVS is Colorado limited liability company whose principal place of business is 12235 Pecos Street, Unit 400, Westminster, Colorado 80234.

2. Defendant Judd Swanson is a resident of the State of Texas residing at 2109 South Boulevard, Houston, Texas 77098.

3. Defendant Office of Museum Research LLC ("OMR") is a Texas limited liability company whose principal place of business is 1502 Sawyer Street, Suite 202, Houston, Texas 77007.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332 as Plaintiff and Defendants are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000. Moreover, Defendants have submitted to jurisdiction in this Court under the applicable agreements, as described below.

5. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this case occurred within this District, and the Parties agreed that the contract that is the subject of this lawsuit, the Asset Contribution Agreement, was to be completely performed in Denver County, Colorado.

## FACTUAL ALLEGATIONS

### EVS's Interest in a Ready-Made Indoor Mapping Solution

6. Founded in 2002, EVS is a technology company based in Westminster, Colorado.  EVS currently has more than 34 employees.

7. EVS's main business is warehouse management software for midsize and enterprise warehouse facilities.  EVS's chief software offering, called mobe3, allows every Apple iOS device to become a mobile warehouse scanner, and allow warehouse operators to track key performance metrics and operate their warehouses more efficiently.

8. In 2020, EVS grew more interested in expanding its warehouse management software capabilities into indoor mapping and location services.

9. Indoor mapping is one of the next frontiers in the world of mobile maps. For consumers, access to indoor maps means the ability to navigate one's way through buildings like airports and malls. For example, Denver International Airport is one of the relatively few airports whose interior is currently available on Apple Maps. The great hall of the airport and the central area of the C Concourse are shown in these screenshots:




10. Indoor mapping and location services not only have practical applications, but commercial ones as well. By way of example, indoor mapping and location services

allow grocery stores to enable their apps for customer navigation to particular products. Retailers can track customer paths through stores and interaction with particular products. And owners of a facility can track—and seek to relieve—locations of overcrowding.

11. Likewise, indoor mapping and location services drastically increase the capabilities of warehouse management software. If a warehouse operator knows where each of its employees is—and not just its inventory—it can, among other things: observe and optimize workflow; track and relieve overcrowding locations; direct first responders to an employee's location in the case of a workplace injury; be notified when employees enter certain areas of the warehouse; find specific employees; and so on.

12. To enable indoor mapping and location services in any iOS application, the application developer needs an indoor mapping file in a particular format, with Apple's approval for that specific file. That format is called Indoor Mapping Data Format ("IMDF"), which Apple created and which the Open Geospatial Consortium formally approved as the industry standard in early 2020.

13. The largest barrier to indoor mapping capabilities is a high-quality IMDF file for each location. IMDF files need to be created somehow. If IMDF files are "manually" created using computer assisted design tools, that process is labor intensive, relatively slow, and relatively expensive. But if IMDF files could be created with minimal to no human involvement by utilizing software, such technology would

allow the first entrant to that market to take a significant lead in indoor mapping and location services.

14. In 2020, none of EVS's competitors in the warehouse management software market had indoor mapping and location services integrated into their software. So, if EVS could find and purchase existing technology—particularly the technology for software-based IMDF creation, it would gain a great competitive advantage in the warehouse management software market.

**The Parties Negotiate and Enter into the Asset Contribution Agreement**

15. Defendants Swanson and OMR claimed to have such a solution.

16. EVS executives met Swanson in August 2020 through a referral by a mutual contact who was in the role of connecting Apple industry partners. OMR had developed a museum-specific smartphone application that utilized indoor mapping and location services, but was looking to commercialize this technology in other ways.

17. OMR and Swanson represented to EVS that its software was capable of producing IMDF files in a matter of hours or a few days instead of the normal weeks- or months-long time period required. Specifically, OMR and Swanson represented to EVS that a relatively simple warehouse space, such as "most buildings of a few floors, even large ones," could be converted into an IMDF file in eight hours—one working day.

18. Swanson even touted OMR's IMDF conversion software as able to build an IMDF file at a speed ten times faster than any competitor.

19. Such ready-made speed fit well with EVS's desire to bring indoor mapping and location services to its warehouse management software in a matter of months.

20. In September 2020, the parties began negotiating a transaction for EVS to acquire OMR's mapping and IMDF conversion software.

21. In December 2020, the parties executed three agreements that governed the terms of their relationship: the Asset Contribution Agreement, the Operating Agreement, and the Employee Agreement.

22. The Asset Contribution Agreement was structured so that OMR contributed all of its mapping and IMDF conversion intellectual property (the "Intellectual Property") to EVS in exchange for (i) OMR eventually becoming an equal partner in EVS, and (ii) EVS employing Swanson. As relevant here, the Asset Contribution Agreement provided:

    a. "On the terms and subject to the conditions herein, OMR contributes, assigns, transfers and conveys to EVS all rights, title and interests in and to the Contributed Assets . . . ." *See* Asset Contribution Agreement § 1.1, attached as Exhibit 1.

    b. As consideration for the Intellectual Property, OMR would receive "membership interests equal to (i) 25% of the future profit and loss allocation of EVS, (ii) 25% of the aggregate capital accounts of EVS, and (iii) 25% of the voting rights, all measured immediately following Closing

   ('<u>Equity Consideration</u>'), which . . . is subject to the following vesting conditions; provided that OMR shall not be entitled to share in any profits or gain attributable to unrealized appreciation in the assets of EVS prior to OMR's admission thereby." *Id*. § 1.3.

c. The vesting schedule provided that 60 percent of OMR's Equity Consideration would immediately vest following the Closing Date of the Asset Contribution Agreement, 20 percent would vest if and when EVS recognizes $1 million in annually recurring revenue from IMDF conversions or any new product developed based on the Contributed Assets ("Qualifying Products"), and the remaining 20 percent would vest if and when EVS recognized $2 million of annually recurring revenue from Qualifying Products. *Id*. § 1.3(a)-(c).

d. But the vesting conditions of Section 1.3 also provided that if Swanson were no longer employed by EVS prior to the vesting milestones tied to annually recurring revenue, then "such vesting will not occur and such portion of the Equity Consideration associated with such vesting milestone will be forfeited and cancelled in its entirety." *See* Asset Contribution Agreement § 1.3(d) (Ex. 1).

e. Swanson and OMR's representations and warranties included a representation and warranty that "Contributed Assets include all Intellectual Property necessary for EVS to sell customers' commercial

- 5 -

    subscriptions to use IMDF conversions as OMR demonstrated or effected immediately prior to Closing." *Id*. § 2.2(7).

f. Swanson and OMR agreed to defend, indemnify and hold harmless EVS "against all claims, suits, proceedings, damages, costs, expenses, and losses (including reasonable attorney fees and costs) . . . incurred by such indemnified Party or person based on or as a result of such Parties' breach of any of their representations, warranties, covenants, or agreements contained in this Agreement." *Id*. § 4.1.

g. "The Parties agree that this Agreement is completely performed in Denver County, Colorado.  This Agreement and its validity, construction, enforcement, interpretation and arbitration or judicial proceeding shall be governed by the substantive law of the State of Colorado without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Colorado.  With respect to any . . . dispute claim or controversy arising under or in respect of this Agreement, each Party irrevocably submits to the exclusive jurisdiction of the state and federal courts located in Denver, Colorado, and agrees to such courts and being a convenient forum." *Id*. § 5.5.

    h.   The Asset Contribution Agreement includes a right to indemnification based on Swanson or OMR's breach of their representations and warranties.  *Id.* § 4.1.

23.    The Employment Agreement was at-will.

24.    The parties understood and agreed that if EVS decided to terminate Swanson for whatever reason before EVS recognized $1 million in annually recurring revenue from Qualifying Products, then Swanson's additional equity would not vest, and he would be left with only 15 percent equity.

25.    The parties executed the Asset Contribution Agreement on December 8, 2020.

26.    Based on Swanson and OMR's representations and warranties regarding OMR's IMDF conversion software, EVS expected to be able to immediately commercialize the IMDF conversions as part of EVS's new warehouse management software app for the Apple iOS App Store called WarehouseLive.  With OMR's IMDF conversion, EVS targeted January 2021—or the first quarter of 2021 at the very latest—for the launch of WarehouseLive.

**Swanson Joins EVS and EVS Learns the Contributed Assets Were at Best a Toolkit Requiring Extensive Work Behind the Curtain**

27.    Swanson began as an EVS employee on or about December 9, 2020.

28.    In the short time between Swanson's hiring and the end of the year, EVS prepared to launch its new products right away.  In addition to WarehouseLive, EVS

prepared a second product, also based on Swanson and OMR's representations and warranties that the IMDF conversions were ready to be commercialized: IMDF as a Service or IMDFaaS.

29. IMDFaaS would offer IMDF conversions to the larger market for warehouse management software. The conversions would be sold "as a service," meaning as a subscription with annually recurring revenue, which is the model much of the technology industry has adopted in recent years.

30. EVS's 2021 budget had expected the company to make $400,000 in mapping sales this year, including $200,000 from WarehouseLive and $200,000 for other IMDF conversions.

31. On December 16, 2020, EVS launched an IMDFaaS website, and announced to contacts at Apple that EVS's new product "addresses the barrier to entry for IMDF adoption: the ambiguity around obtaining a high-quality IMDF package in a fast, economical manner that allows developers or end-users streamlined access to the Apple Indoor Maps Program."

32. In connection with that announcement, EVS drafted a press release that reflected Swanson and OMR's representations and warranties. The draft press release said that "IMDFaaS's team of geospatial experts utilize a proprietary software to automate much of the manual effort needed to translate the CAD, BIM, GIS, or PDF file into an accurate IMDF package, which exponentially accelerates the process while maintaining detail and precision."

33. But Swanson and the OMR software just weren't ready for market—far from it.

34. On the contrary, and quickly, a stark disconnect emerged between Swanson and OMR's representations about the OMR software capabilities on the one hand, and its actual performance on the other. Put simply, Swanson clearly was in over his head, because he had sold a homemade toolkit requiring extensive human labor dressed up as a market-ready, plug-and-play technological solution.

35. EVS looked to Swanson to lead EVS's mapping department as a senior vice president and equal business partner. But within the first couple weeks on the job, Swanson grew less responsive despite the increasing need to produce.

36. In late December 2020, Swanson began revealing to his business partners what they had bought. EVS was making a significant marketing push for the mapping business, and Swanson was concerned that he could not perform the significant labor needed to produce IMDF conversions.

37. In a December 29, 2020 email, Swanson told his partners, "If the mapping side of things takes off (either through [Warehouse] Live or IMDFaaS or both) I'll be underwater by myself at > 5 new customers per month. To lighten the load I'd need a CAD literate person who can do the first part of the conversion process (doing the geometry side of the conversion)."

38. And in that same email, Swanson also told his new partners he needed a programmer to "work on making those conversions more time efficient – especially in terms of making the tools usable for people who aren't IMDF specialists."

39. According to Swanson, the OMR software would not be able to handle five IMDF conversions per month. It would need much more labor than that. And to become "more time efficient," the OMR software still required significant programming work.

40. Contrary to Swanson and OMR's representations and warranties, OMR's software wasn't remotely capable of converting a large, multi-floor warehouse in one business day. And OMR's software was not ready to be commercialized.

41. Instead of a market-ready software package, EVS began to realize that it had bought *at best* a collection of software tools, several of which were third-party proprietary software (meaning, of course, neither OMR nor EVS owned them), and that all meant that a great deal of trained labor was still required to produce IMDF conversions.

42. Scott Kameron, EVS's President and Chief Operating Officer, immediately responded to Swanson's December 29, 2020 email: "I was under the impression (show[s] my lack of understanding of the IP) that the tools from the asset contribution were already commercialized, meaning could be used by resources other than a 'Judd' level expert to do the conversions."

43. Indeed, when Swanson drafted the geospatial department's business plan for the first quarter of 2021, it continued to reveal that the software package was not market-ready. The top action item was "[c]ontinue development of conversion process," which included "[o]rganize IMDF conversion process & create teaching materials to facilitate expected need for increased labor over course of a year," and "[c]reate dev roadmap for IMDF conversion process." If the IMDF software had been what OMR and Swanson had represented and warranted, none of this work would have been necessary to bring IMDF conversions to market.

44. In the initial months of 2021, Swanson and OMR would continue to disabuse EVS of its understanding that the OMR software was already commercialized—costing EVS a unique opportunity in front of Apple, existing customers, and potential new customers.

45. Anticipating IMDF's formal adoption as the industry-wide standard for indoor maps, EVS worked closely with Apple on multiple fronts.

46. Apple was planning a virtual conference for the warehouse software industry, and positioned Swanson and EVS's IMDF capabilities at the center of that event.

47. Apple provided input to EVS's press release in connection with the announcement of IMDF's adoption.

48. And Apple introduced multiple enterprise-level customers—ones with household names and many millions of square feet ripe for IMDF conversions—to EVS as one of the market leaders in the IMDF conversion space.

49. At the same time, EVS acted to develop WarehouseLive based on the supposed market-ready capabilities of OMR's IMDF conversion software. EVS offered three of its existing customers free IMDF conversions, so that EVS could develop the application and work out any initial software bugs.

50. But those IMDF conversions for existing customers took weeks and months instead of days—and in one case had to be completed by an outside firm after Swanson's termination. Projects that began in January and February 2021 lingered into April, May, and June.

51. The long delays for these IMDF conversions pushed EVS's launch of WarehouseLive's testing or "beta" version into the second quarter of 2021.

52. As EVS waited on the performance of OMR's software—and held Swanson accountable for deadlines and deliverables—the relationship between EVS and Swanson grew strained. Swanson and OMR had committed to producing something that didn't yet exist, and the labor required to produce the end product was far greater than Swanson and OMR had represented.

53. In April and May 2021, EVS had to commit more resources just to project manage Swanson and hold him to particular deadlines for both the IMDF conversions and development of WarehouseLive. Swanson chafed against this accountability.

54. In the first five months of 2021, EVS managed to sell just one IMDF conversion, at a price of less than $2000 and at a significant loss.

55. By late May 2021, Swanson's strain and frustration boiled over, as he was forced to admit that, in his words, it was "bullshit" that "You can plug in a CAD file to some conversion software." According to Swanson, the fundamental sales case for EVS's IMDF conversions—i.e., the basic premise behind EVS's purchase of OMR's Intellectual Property, and what Swanson and OMR had represented and warranted in the Asset Contribution Agreement—was "not true." Swanson concluded: "[M]aking it seem simple is both disingenuous and fucking destroying our sales."

56. On June 14, 2021, EVS exercised its right to terminate Swanson's at-will employment.

57. Once EVS's remaining partners and management team more directly assessed the state of the OMR mapping software, what they found only further confirmed how far from market-ready it had been—and still was.

58. The mapping software was still incomplete, and still required hundreds of development hours for commercialization.

59. The software's documentation was negligible at best, and certainly not enough to guide another skilled user to replicate the work.

60. In the end, without Swanson operating the homemade toolkit with extensive labor, the "intellectual property" EVS had bought consisted of fragments of

very little value. In exchange for something of little value, OMR and Swanson had received 15% of EVS's equity.

61. Swanson and OMR's breaches of their representations and warranties regarding the OMR software have damaged EVS in multiple ways.

62. Since EVS terminated Swanson, it has invested more than $150,000 to reverse engineer a useful commercial product for IMDF conversions.

63. Meanwhile, as an interim solution to allow WarehouseLive to proceed, and while EVS creates its own workable IMDF conversion software, EVS has had to procure IMDF conversions from third-party engineering firms.

64. Most damaging to EVS, however, is that it now has lost out on a prime opportunity to be the first to offer indoor mapping and location services in the warehouse management software market. This advantage would have allowed EVS to capture a significant share of that market, and become the undisputed market leader. Instead, due to OMR and Swanson's breaches, it is hustling to enter the market along with other entrants as part of the collective first wave.

65. Not only were OMR and Swanson's breaches quite substantial, but the injury caused by this lost opportunity is irreparable. In emerging technology markets, a software publisher has only one chance to be "first" and build the goodwill and market share that follow such an achievement.

66. Under these circumstances, the full scope of the lost opportunity damages would be inadequate, difficult, or impossible to assess.

67. Therefore, rescission is an available, and the most appropriate, remedy here.

## FIRST CLAIM FOR RELIEF
### (Rescission)

68. EVS incorporates the preceding paragraphs by reference as if fully set forth herein.

69. Under Colorado law, rescission of a contract may be granted if the facts show that there is a substantial breach, that the injury caused is irreparable, or that damages would be inadequate, difficult, or impossible to assess.

70. EVS, OMR, and Swanson are parties to the Asset Contribution Agreement.

71. Swanson and OMR substantially breached their representation and warranty that the "Contributed Assets include all Intellectual Property necessary for EVS to sell customers' commercial subscriptions to use IMDF conversions as OMR demonstrated or effected immediately prior to Closing."

72. Swanson and OMR's breaches caused irreparable injury to EVS.

73. Swanson and OMR's breaches caused damages to EVS that would be inadequate, difficult, or impossible to assess.

74. EVS is entitled to rescission of the Asset Contribution Agreement, and restitution restoring the parties to the status quo ante.

## SECOND CLAIM FOR RELIEF
**(Breach of Contract, in the Alternative)**

75. EVS incorporates the preceding paragraphs by reference as if fully set forth herein.

76. EVS, Swanson, and OMR are parties to the Asset Contribution Agreement.

77. The Asset Contribution Agreement is a valid, binding, and enforceable contract.

78. EVS performed its obligations under the Asset Contribution Agreement.

79. Swanson and OMR breached their obligations under the Asset Contribution Agreement because, at the time of Closing, the representation that "Contributed Assets include all Intellectual Property necessary for EVS to sell customers' commercial subscriptions to use IMDF conversions as OMR demonstrated or effected immediately prior to Closing" was false.

80. As a direct and proximate result of Swanson and OMR's breaches, EVS has suffered damages and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Escape Velocity Systems, LLC respectfully requests that the Court enter judgment in its favor, and against Defendants Judd Swanson and Office of Museum Research LLC, and order as follows:

A. That judgment be entered in EVS's favor and against defendants on each of the Claims set forth herein;

    B.  That the Asset Contribution Agreement be rescinded in its entirety;

    C.  That EVS be awarded restitution restoring the parties to the status quo ante the Asset Contribution Agreement;

    D.  That EVS be awarded compensatory damages in an amount to be proven at trial;

    E.  That EVS be awarded pre- and post-judgment interest as provided by Colorado law;

    F.  That EVS be awarded its attorneys' fees, costs, and expense; and

    G.  That EVS be awarded any and all further relief the Court deems just and proper.

Dated: October 14, 2021

Respectfully submitted,

/s/ David C. Holman
David C. Holman
CRISHAM & HOLMAN LLC
2549 West Main Street, Suite 202
Littleton, Colorado 80120
dave@crishamholman.com
Tel: (720) 739-2176

*Attorneys for Plaintiff Escape Velocity Systems, LLC*